UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| REBECCA FORD, | ) | Civil Action No.: 4:05-1893-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| MCLEOD REGIONAL MEDICAL | ) | |
| CENTER OF THE PEE DEE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff filed this action in the Florence County Court of Common Pleas on May 26, 2005,

which was subsequently removed to this Court on July 1, 2005. Plaintiff asserts causes of action for

discrimination, retaliation and harassment in violation of the Americans with Disabilities Act of

1990, 42 U.S.C. § 12101 et seq. Presently before the Court is Defendant's Motion for Summary

Judgment, filed July 3, 2006.

## FACTS

Plaintiff is an African-American female. In 1979, Plaintiff was hired by Defendant as an

Insurance Clerk. Plaintiff's Dep. at 11. At some time, the job title changed from Insurance Clerk

to Patient Account Representative (PAR), but the job duties remained the same. Id. at 11-12. As

an Insurance Clerk and, later, as a PAR, Plaintiff handled filing insurance claims and collecting

payment for patients' bills through their insurance carriers. Id. at 12-13.

In 1994, Plaintiff became the Assistant Patient Account Manager within the Business

Services Department at McLeod. Id. at 11. While Plaintiff continued to perform some insurance

and collection work, she was mainly responsible for supervising the PARs that reported to her. Id.

1

at 16-17. In addition to supervising the PARs' daily activities, Plaintiff also performed employee evaluations, reviewed time records, and set work schedules. Id.

In March of 2003, Plaintiff was diagnosed with primary progressive multiple sclerosis (MS). Id. at 21. In July of 2003, Plaintiff received a performance evaluation rating of "role model," and Plaintiff agreed that it was an accurate evaluation. Id. at 110-11, ex. 11. The evaluation was performed by David Gasque, the Patient Account Manager and her direct supervisor, and approved by Gary Morris, the Director of Business Services. Id. at 109. On the evaluation, Morris stated, "Thanks Becky for being here when it would be easier to be at home." Id. at 111-12, ex. 11.

In October of 2003, Plaintiff took a thirty-day medical leave of absence to begin treatments. Id. at 18. When she returned from her medical leave Morris was very supportive and praised her for her work in the Business Services Department. Id. at 17-18. He indicated that he was glad she was back. Id. Plaintiff believed that Morris was sincere in his comments. Id. at 18.

In August of 2004, Morris asked Plaintiff to think about returning to a position as PAR with the same rate of pay that she was currently making as Assistant Patient Account Manager. Id. at 67. According to Plaintiff, Morris stated that he thought the management position might be a little fast-paced for her because he noticed that she was moving slower and having more difficulty walking. Id. Mike Browning, Chief Financial Officer for Defendant, was aware of Morris' decision to ask Plaintiff to step down to the PAR. Browning Dep. at 12-16. From his recollection, Morris was concerned only with the fact that Plaintiff had difficulty getting "up and around to be able to supervise her staff." Browning Dep. at 14. However, Morris stated in his deposition that, following her return from her leave of absence, Plaintiff began struggling with some new systems that had been implemented when she was gone. Morris Dep. at 6-7. He stated that he asked her to step down because he had issues or concerns with her performance as a supervisor. Id.

-2-

Gasque also testified that he saw changes in Plaintiff's performance upon her return from medical leave. Gasque Dep. at 17. According to Gasque, Plaintiff began referring issues to him that she should have handled at an Assistant Patient Account Manager. Id. Gasque also felt that Plaintiff could not effectively supervise her employees because she was unable to "get up and move around on the floor." Id. at 17-18.

Browning testified that McLoed was not asking Plaintiff to take a demotion; rather, it was trying to accommodate her because of her struggles with her illness. Browning Dep. at 15-16. He stated that it was the "compassionate thing to do from McLeod's perspective." Id. However, he did note that Plaintiff never asked for such an accommodation. Id. In fact, Plaintiff informed Gasque that she wanted to keep her management position. Id. at 80. Nothing more was said regarding the PAR position by either Gasque or Morris, and Plaintiff remained in position as Assistant Patient Account Manager. Id. at 80-81. Plaintiff stated in her deposition that Morris never told her she had to take the PAR position but only asked if she would be willing to take it. Id. at 81.

Following Morris' request that she consider returning to the PAR position, Plaintiff began to feel that Morris was trying to force her out of her job. Id. at 83. In fact, Plaintiff stated that Gasque told her that Morris would try to push her to the point where she would step down. Id. at 77. Gasque denies making this comment. Gasque Dep. at 35. Plaintiff also stated that Gasque wanted her to remain in her position as Assistant Patient Account Manager. Plaintiff Dep. at 76. Plaintiff believed that Gasque sincerely wanted her to remain in her management position. Id. at 77. Morris resigned from employment with McLeod on September 29, 2004.

In her deposition, Plaintiff testified that, as she looked back on her employment with McLeod, she began to think that Gasque was not as sincere in his statements to her as she had once believed and that he was trying to push her out just as much as Morris. Id. at 79-80, 138-39.

-3-

According to Plaintiff, Gasque was not supportive of her while she was on medical leave because, rather than deal with certain issues that arose while she was gone, he left them for her to deal with once she returned. Id. at 27-28. However, Plaintiff indicated that Gasque probably failed to deal with those issues not because of her MS, but because he didn't want to deal with the responsibility of handling them. Id. at 27-30.

Plaintiff claims that as her MS developed, her work environment became more hostile, and she provided examples of the alleged hostility in her deposition. For instance, just before Plaintiff left for medical leave in late 2003, she participated in training for EDI, a new billing system being implemented in the Business Services Department. Plaintiff Dep. at 36. She was unable to participate in some of the on-the-job training while she was on leave, but otherwise was provided with the same training as the other employees in the Business Services Department. Id. at 36; Gasque Dep. at 8. When she returned from medical leave, Joyce Brockington, Project Manager, offered to assist Plaintiff with the new program if she need help. Plaintiff Dep. at 39-40. Plaintiff agreed in her deposition that the implementation of the EDI program while she was on leave was not an attempt to discriminate against her. Id. at 35. Gasque and Brockington felt that Plaintiff was resistant to learning the new billing system when she returned from leave. Gasque Dep. at 9; Brockington Dep. at 16-17.

Plaintiff traveled to one of the training sessions with several other employees in the Business Services Department, including Gasque. Plaintiff Dep. at 42. She was using a walker at the time and told Gasque, who was driving, that she had a handicapped placard that he could use to park. Id. at 43-44. When Gasque attempted to pull into a handicapped parking space, another one of the passengers, B.J. Collins, commented that he should leave that space for someone who is really handicapped. Id. at 43. Gasque then pulled out of the handicapped space and parked in a space

-4-

directly beside the handicapped space. Id. Plaintiff testified in her deposition that she was hurt by the incident. Id. However, she also testified that Gasque probably did not think that parking one space over was a big deal and did not feel that the comment was made by Collins with the intent of being mean to her. Id. at 47-49.

Edna Young, the other Assistant Patient Account Manager in Business Services, resigned in 2004. Gasque Aff. ¶ 2. As a result, Plaintiff, Gasque and Brockington each had to assume some of the day-to-day responsibilities of Young's job. Plaintiff Dep. at 88-89. Plaintiff believes that Morris and/or Gasque were slow to fill the Young's position in an attempt to force her to quit her job. However, Young's position was posted on the McLeod Intranet on April 23, 2004, approximately one month prior to her last day of work, which was May 19, 2004. Gasque Aff. ¶¶ 2-3. External adds were published in May and June of 2004. Id. Robert Morgan, and external applicant, interviewed for the position on June 25, 2004, and was offered the job in early July 2004. Id. Morgan took some time to decide whether to take the position but officially declined on September 13, 2004. Id. Additional adds were posted in October of 2004, and the position was filled on November 22, 2004. Id.

Shortly after Young resigned, Gasque transferred one of Plaintiff's PARs over to the group formerly supervised by Young. Id. at 62-63. Plaintiff believes that the transfer was an effort by Gasque and Morris to try to put more work on her so that she would resign her position, but she acknowledged in her deposition that it is possible that the other unit needed more help than her unit. Id. at 63-64. Elizabeth Osbourne, one of Plaintiff's employees, testified in her deposition that she thought that Morris and Gasque transferred another one of Plaintiff's employees to the other department to increase the workload for Plaintiff to make it appear as if she could not handle her job.

-5-

Osbourne Dep. at 15-16. Sherrie Jordan also testified that she felt that Morris and Gasque were trying to get rid of Plaintiff. Jordan Dep. at 16.

Plaintiff also believes that her performance evaluation of September 2004 was another attempt by Morris and Gasque to force her out of her position. Although she received an overall performance rating of "successful," Plaintiff disagrees with a comment Morris included in the evaluation that "I need Becky to be more willing to make decisions on individual account questions for PARs instead of deferring the decision to the Patient Account Manager." Plaintiff Dep. at 98 and Ex. 7. Plaintiff noted on the evaluation form, "I disagree with this evaluation and feel as though I'm being discriminated [sic] because of my disability." Plaintiff Dep., Ex. 7.

Plaintiff also testified in her deposition that she was not satisfied with the response she received from representatives of Defendant concerning how she would be removed from the building in the event of a fire. Id. at 116-17. Browning and another employee both indicated that they would personally carry her down the stairs if necessary in the event of a fire. Id. Nevertheless, Plaintiff was uncomfortable because she did not feel that Defendant had a definite fire escape plan for her. Id. at 118-19.

Finally, Plaintiff discovered in 2005 that, while she was out on medical leave in 2003, Morris asked another employee, Chuck Kelly, if he would be interested in Plaintiff's position if she decided not to return from medical leave. Id. at 51-53. According to Kelly, Morris knew that he was interested in working in the Business Services Department and asked only informally if he would be interested in the position if they job became available. Kelly Dep. at 6, 9, 12, 14. Kelly told Plaintiff about his conversation with Morris in April of 2005. Plaintiff Dep. at 51.

When Plaintiff returned to work from her medical absence in November of 2003, she began keeping a diary of her experiences at work. Id. at 158; Ex. K to Plaintiff's Response. In her

deposition, Plaintiff indicated that she kept the diary because she "was told a long time ago that once you go out on FMLA your days are numbered at McLeod." Id. The diary entries reflect Plaintiff's emotional state during what Plaintiff perceived to be attempts by Morris and Gasque to force her to quit. For example, on September 22, 2004, Plaintiff wrote,

> 9:30 p.m. and I cried just about all afternoon and evening. I'm so afraid they're going to come up with false allegations . . . just anything to get me out. I started feeling immense pressure after our interview this afternoon once David let me know that Alice would be transferring to the Gov't end effective October 1, 2004. . . . They both knew this upset me and I left as soon as I could, knowing I was about to cry. I went back to my desk trying not to show my emotion but this was impossible. I tried so hard not to cry, but I could not stop crying. A few of the PAR's [sic] came to me, upset themselves, to tell me that Gary and David are just trying to break me and they're not going to let that happen.

Ex. K to Plaintiff's Response. On September 23, 2004, Plaintiff wrote, "I've always done well to hide my emotions. But, with all they are putting me through, its getting harder and harder. When I got back to my desk, I called Dr. Rainwater's office to see if I could get my appointment moved up."[1] Id.

McLeod attempted to improve Plaintiff's work environment by making certain accommodations within the Business Services Department. In January of 2004, Plaintiff requested that the restroom outside the Business Services Department be equipped with a handicapped rail. Plaintiff Dep., Ex. 12. Although the restroom in the main hallway was handicap accessible, McLeod installed the rail in the other restroom as requested by Plaintiff because the other restroom was closer to Plaintiff's work area. Plaintiff Dep. at 121 and Ex. 12. Defendant also purchased a printer for Plaintiff's desk so she would not have to leave her desk to retrieve documents from the department

---

[1] Dr. Avie Rainwater is Plaintiff's psychiatrist, who Plaintiff began to see as a result of the pressures she felt at work. Plaintiff Dep. at 167-171.

printer. Gasque Aff. ¶ 6. Plaintiff asserts that she asked for the printer a year before she actually got one. Plaintiff Dep. at 126.

In February of 2004, Plaintiff's physician indicated that Plaintiff may need to occasionally come into work late because of her MS condition. Plaintiff Dep., Ex. 2. As a result, Defendant allowed her to have a flexible work schedule. Id. at 32-33.

In the summer of 2004, Defendant adjusted the timer on the automatic doors in the Business Services Department to give Plaintiff more time to get through the doors before they closed. Id. at 124-25. In October of 2005, Defendant had the automatic doors completely rebuilt to make accessing the Business Services Department easier for Plaintiff. Id. at 124-25, Ex. 13. Again, Plaintiff asserts that she asked that something be done about the doors approximately a year before anything happened. Plaintiff Dep. at 123-24.

Plaintiff continued working as an Assistant Patient Account manager until December of 2005, when she received a disability rating of 100 percent and was no longer able to work. Broughton Aff. at ¶ 4. Plaintiff was placed on a medical leave of absence in accordance with McLeod's policies and procedures. Id. The medical leave of absence expired on May 15, 2006. Id. During her deposition on May 8, 2006, Plaintiff indicated that she had just been approved to receive long-term disability benefits. Plaintiff Dep. at 183.

Plaintiff filed a Charge of Discrimination with the EEOC in September of 2004, and received a Right to Sue notice from the EEOC on March 7, 2005. Plaintiff filed the present action on May 25, 2005. Plaintiff alleges that Defendant (1) discriminated against her because of her disability by asking her to step down from the Assistant Patient Accounts Manager position into the PAR position, (2) retaliated against her when she chose not to do so, and (3) created a hostile work environment in an attempt to force her to resign.

-8-

## DISCUSSION

*Summary Judgment Standard*

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See also Celetex

Corp. v. Catrett, 477 U.S. 317, 324 (1986)(Rule 56(c) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves"). To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings. Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Celetex Corp. v. Catrett, 477 U.S. 317, 322 (1986).    See also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

***Disability Discrimination Claim***

Plaintiff alleges that Defendant discriminated against her because of her disability by asking her to step down from the Assistant Patient Accounts Manager position into the PAR position. To prove a violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12203 (ADA), a plaintiff must establish that (1) she has a disability; (2) she is a qualified individual; and (3) she suffered an adverse employment action that constituted unlawful "discrimination" based on her disability. E.E.O.C. v. Stowe-Pharr Mills, Inc., 216 F.3d 373, 377 (4th Cir.2000); Martinson v. Kinney Shoe Corp., 104 F.3d 683,686 (4th Cir. 1997). Defendant concedes for purposes of summary judgment that Plaintiff has a disability and is a qualified individual. See Defendant's Memorandum in Support of Motion for Summary Judgment at 16. However, Defendant asserts that Plaintiff's claim fails because she has not suffered an adverse employment action.

Conduct short of "ultimate employment decisions – to hire, discharge, refuse to promote, etc. – can constitute an adverse employment action under Title VII." Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001). Retaliatory harassment also can constitute an adverse employment action. Id. (Citing Ross, 759 F.2d at 363). Plaintiff must establish that the challenged discriminatory acts

4:05-cv-01893-RBH     Date Filed 02/14/07     Entry Number 30     Page 11 of 18

of harassment adversely affected "the terms, conditions, or benefits" of her employment. Id. (citing

Munday v. Waste Mgmt. Of North America, Inc., 126 F.3d 239,243 (4th Cir. 1997)). Thus, plaintiff

must show (1) acts or harassment which (2) adversely affected (3) the terms, conditions, or benefits

of her employment.

Factors other than the terms and conditions of employment may be examined in determining

whether or not an adverse employment action has occurred, but the change must be material.

Burlington Northern & Santa Fe Rwy. Co. v. White, 126 S.Ct. 2405, 2415 (2006). Plaintiff must

show that the change in her employment status was significant. See Von Gunten, 243 F.3d at 868

(a significant change in job assignment can adversely effect a person's terms, conditions and benefits

of employment); See generally Burlington Industries, Inc. v. Ellerth, 118 S.Ct. 2257, 2268 (1998)("A

tangible employment action constitutes a significant change in employment status, such as...a

decision causing a significant change in benefits."); Page v. Bolger, 645 F.2d 227, 233 (4th Cir.

1981); Crady v. Liberty Nat. Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993)("A

materially adverse change might be indicated by a termination of employment, a demotion evidenced

by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices that might be unique to a particular situation.");

cf. Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 887 (6th Cir. 1996)(demotion without

change in pay, benefits, duties or prestige insufficient); Harlston v. McDonnell Douglas Corp., 37

F.3d 379, 382 (8th Cir. 1994)(reassignment to a more inconvenient job insufficient); Williams v.

Bristol-Myers Squibb, 85 F.3d 270, 274 (7th Cir. 1996)(A transfer that does not involve a demotion

in form or substance does not rise to the level of an adverse employment action).

Defendant characterizes its request that Plaintiff take the PAR position as a "reassignment,"

while Plaintiff characterizes it as a "demotion." The "reassignment" or "demotion," while not

accompanied by a decrease in pay, would have resulted in a less distinguished title for Plaintiff as well as significantly diminished material responsibilities in light of the fact that Plaintiff would have been moved from a supervisory position to a non-supervisory position. Thus, had Plaintiff been moved from the Assistant Patient Accounts Manager position to the PAR position, the move likely would have been considered an adverse employment action. However, it is undisputed that Plaintiff was not moved to the PAR position and remained an Assistant Patient Accounts Manager until she was determined to be 100% disabled and could no longer work. The decision was left with Plaintiff as to whether she wanted to move back to the PAR position. Therefore, no adverse employment action was taken by Defendant.

Plaintiff maintains that the mere suggestion by Defendant that she take the PAR position violated the ADA. According to Plaintiff, Defendant's request limited Plaintiff's value as an employee. However, the cases cited by Plaintiff in support of this theory are all distinguishable from the present case because they involved actual adverse actions on the part of the employer. See School Board of Nassau Co. v. Arline, 480 U.S. 273 (1987) (termination); Taylor v. United States Postal Service, 946 F.2d 1214 (6th Cir. 1991) (failure to hire); Rodriguez v. ConAgra Grocery Products Co., 436 F.3d 468 (5th Cir. 2006) (refusal to hire); Forsyth v. City of Dallas, 91 F.3d 769 (5th Cir. 1996) (transfer to less prestigious position); Click v. Copeland, 970 F.2d 106 (5th Cir. 1992) (transfer to less desirable position); Rizzo v. Children's World Learning Center, 173 F.3d 254 (5th Cir. 1999) (reduction in hours and reassignment). Plaintiff has failed to establish that she suffered an adverse employment action and, thus, her claim for discrimination based upon her disability fails as a matter of law.

-12-

*Retaliation Claim*

Plaintiff also claims that Defendant retaliated against her after she decided not to take the PAR position. The ADA provides that ""[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42. U.S.C. § 12203(a).

For a plaintiff to state a prima facie case for retaliation, she must present evidence that (1) she "engaged in conduct protected by the ADA;" (2) she "suffered an adverse action subsequent to engaging in the protected conduct;" and (3) "there was a causal link between the protected activity and the adverse action." Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216 (4th Cir.2002). Although a plaintiff is not required to establish that the opposed conduct was actually an ADA violation, she must at a minimum establish a reasonable, good faith belief that the opposed conduct violated the ADA. See id.; see also Peters v. Jenney, 327 F.3d 307 (4th Cir. 2003) (citing Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1312 (11th Cir.2002)) ("The inquiry is therefore (1) whether [plaintiff] 'subjectively (that is, in good faith) believed' that the district had engaged in a [illegal practice], and (2) whether this belief 'was objectively reasonable in light of the facts,' a standard which we will refer to as one of 'reasonable belief.'").

Defendant asserts that Plaintiff did not engage in any protected activity by deciding not to take the PAR position. The undersigned agrees. Protected activity falls into two distinct categories: participation or opposition. See 42 U.S.C. § 12203(a). Plaintiff claims that she was engaged in opposition activity. The scope of protection for opposition activity is more narrow than that of participation activity. Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 259 (4th Cir. 1998). It encompasses the utilization of "informal grievance procedures as well as staging

-13-

informal protests and voicing one's opinions." Id. To determine whether or not there is legitimate opposition activity, courts should "balance the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." Id. (internal quotes omitted).

While Plaintiff's subjective beliefs may exist, such beliefs are not objectively reasonable. She did not complain to anyone about the suggestion or request to transfer to the PAR position. She declined the request and maintained her management position. This is far short of staging a protest or voicing her opinion that Morris' request was a discriminatory action. In short, Plaintiff never "opposed" Morris' request that she take the PAR position.

Additionally, Plaintiff fails to show that she suffered an adverse employment action. She claims that Morris and Gasque retaliated against her by giving her a performance evaluation of "successful" rather than "role model." However, a less-than-perfect evaluation does not equal an adverse employment action because any change in Plaintiff's employment status as a result of the evaluation would not be material. See Burlington Northern & Santa Fe Rwy Co., 126 S.Ct. 2405, 2415 (2006). Because Plaintiff has failed to show that she engaged in protected activity or that she suffered an adverse employment action, summary judgment is appropriate on her retaliation claim.

***Hostile Work Environment Claim***

Finally, Plaintiff asserts that Defendant attempted to force her to resign by creating a hostile work environment. To prevail on a hostile work environment claim based on disability, a plaintiff must establish that (1) she is a qualified individual with a disability; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some

-14-

factual basis exists to impute liability for the harassment to the employer. Fox. v. General Motors Corp., 247 F.3d 169, 177 (4th Cir. 2001) (citing Brown v. Perry, 184 F.3d 388, 393 (4th Cir. 1999)). As stated above, Defendant concedes for purposes of this motion that Plaintiff is a qualified individual with a disability. However, Defendant argues that Plaintiff has failed to present sufficient evidence to establish the remaining elements of her claim.

Plaintiff "must demonstrate not only that [s]he subjectively perceived [her] workplace environment as hostile, but also that a reasonable person would so perceive it, i.e., that it was objectively hostile." Fox, 247 F.3d at 178. Defendant asserts that Plaintiff's work environment was neither subjectively nor objectively hostile. According to Defendant, Plaintiff did not perceive the alleged hostile events as hostile at the time they occurred but only after thinking back about them. Plaintiff testified during her deposition that she did not realize Morris and Gasque were not supportive of her or her condition until Morris asked her to take the PAR position in August of 2004. Plaintiff Dep. at 34. However, many of the events that Plaintiff alleges created the hostile work environment occurred prior to Morris' request. The following timeline is illustrative:

- March, 2003–Plaintiff was diagnosed with MS;

- August, 2003–Plaintiff participated in training for the new EDI Billing System and while traveling to a training session with Gasque and a coworker, B.J. Collins, Gasque attempted to park in a handicapped space for Plaintiff, Collins commented that they should save the space for someone who was really handicapped, and Gasque then parked in another space;

- October, 2003–Plaintiff took a medical leave of absence;

- November, 2003–Plaintiff returned from medical leave and had to perform job duties that she felt should have been handled by Gasque while she was gone;

- April, 2004–Defendant advertised the upcoming vacancy of Edna Young's position;

- May 19, 2004–Edna Young resigned, Plaintiff, Gasque, and another employee had to assume some of Young's duties, and one of Plaintiff's PARs was transferred the department formerly supervised by Young;

-15-

- July, 2004–Defendant made an offer for the vacant position;

- August, 2004–Morris asked Plaintiff if she wanted to move to the PAR position and Plaintiff declined shortly thereafter;

- September, 2004–the offer for the vacant position was declined;

- September 2004–Plaintiff received a performance evaluation of "successful" rather than "role model;"

- October, 2004–the vacant position was filled;

- December, 2005–Plaintiff is given a 100% disability rating and can no longer work.

Defendant argues that, because Plaintiff did not perceive the events as harassing at the time they occurred, the events, therefore, were not subjectively hostile.

Defendant also asserts that the alleged harassing events were not objectively hostile because no reasonable person could perceive them as hostile. In fact, even Plaintiff agreed that there were logical explanations for the events she claims were hostile. Plaintiff agreed that her coworker, B.J. Collins, probably did not make the inappropriate comment with the intent of hurting her feelings and that Gasque probably parked in the non-handicapped spot because it was right next to the handicapped spot. Plaintiff Dep. at 47, 49. Plaintiff acknowledged that Defendant did not implement the new billing system while she was on medical leave as an intentional way to discriminate against her and that she was offered additional help learning the system when she returned from leave. Id. at 35. She stated that Gasque probably failed to perform some of her job duties while she was on medical leave, not in an attempt to discriminate against her, but because he was a "poor" Patient Account Manager and simply failed to "step up to the plate." Id. at 27, 29, 30. Plaintiff further acknowledged that she had no knowledge of Defendant's attempts to fill Edna Young's position, Id. at 92, and agreed that the unit formerly supervised by Young, the governmental billing unit, was more complicated that her unit, the commercial billing unit, and could possibly have

-16-

needed the extra PAR that was transferred from her unit, Id. at 63-64. Finally, Plaintiff agreed that a performance evaluation of "successful" is a good rating. Id. at 95.

Even if the actions of Morris and Gasque were unwelcome, Plaintiff has failed to present sufficient evidence that they were based on her disability. The critical issue for consideration when determining whether unwelcome conduct is based on a plaintiff's disability is whether the plaintiff has been "exposed to disadvantageous terms or conditions of employment to which [non-disabled employees] are not exposed." Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir.2003). Plaintiff admitted that many employees, including Gasque, had to assume additional duties when Edna Young resigned. In addition, all employees had to learn the new billing system. Furthermore, Plaintiff has failed to show that her performance evaluation was lower than the evaluations of other, nondisabled employees who performed similarly to her.

Finally, even though B.J. Collins' comment about the severity of her disability may not have been welcome by Plaintiff, it was not sufficiently severe or pervasive to alter the terms, conditions or privileges of her employment. "[S]imple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. Boca Raton, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

Plaintiff has failed to meet the third and forth elements of her hostile work environment claim as to any of the alleged hostile actions. No reasonable juror could conclude that the alleged harassment was based on her disability or that it was sufficiently severe or pervasive to alter the terms and conditions of her employment. Therefore, it is unnecessary to address the fifth element, i.e., whether some factual basis exists to impute liability for the harassment to Defendant, and summary judgment is appropriate on this claim.

-17-

## CONCLUSION

In light of the above analysis, it is recommended that Defendant's motion for summary judgment be granted in its entirety and Plaintiff's claim dismissed.

 s/ Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

February 13, 2007
Florence, South Carolina

**The parties' attention is directed to the important notice contained on the following page(s).**